# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| ROY A. GOODSON, | } | **CASE NO. 17-41820-JJR** |
| | } | **Chapter 13** |
| Debtor. | } | |

| | | |
|---|---|---|
| ROY A GOODSON, | } | |
| | } | |
| Movant, | } | |
| v. | } | **CM/ECF Doc. 16** |
| | } | |
| CYNTHIA BOONE GOODSON and | } | |
| CANDICE SHOCKLEY, | } | |
| | ) | |
| Respondents. | } | |

## MEMORANDUM OPINION

### I – Introduction

Cynthia Boone Goodson ("Boone") initiated a lawsuit (the "Lawsuit") against her ex-husband, Roy A. Goodson (the "Debtor") by filing a Petition for Rule Nisi (the "Nisi Petition") in the Jefferson County, Alabama Circuit Court (the "Circuit Court") to collect a monetary property settlement awarded to her in their divorce.[1]  The Nisi Petition demanded payment of the property settlement obligation (the "Obligation"), and if the Debtor failed to pay, wanted him held in civil

---

[1]The Circuit Court trial of the Lawsuit was transcribed and the transcript is part of the record in this case.  References herein to the transcript are cited as "Trans." followed by the applicable page number(s). The parties agreed on the record that the full Circuit Court transcript, part of which this court received via email from the Debtor's counsel and part of which was filed in CM/ECF as Exhibit "A" to Doc. 41, was admitted in its entirety as an exhibit for both parties.

contempt and incarcerated. At the close of the first day of trial, the Circuit Court judge (the "Circuit Judge") continued the trial for several days and admonished the Debtor to pay the Obligation before trial resumed so the Lawsuit could be dismissed and he could avoid going to jail. The Debtor did not come up with the money necessary to pay the Obligation, and a few days before trial resumed, he filed a case under chapter 13 of the Bankruptcy Code[2] seeking protection under the automatic stay. When trial resumed, the Circuit Judge was told of the Debtor's bankruptcy. She became incensed, and stated that she knew enough bankruptcy law to know the automatic stay did not apply to criminal proceedings. As retribution for the Debtor's seeking bankruptcy protection, and for the express purpose of eluding the automatic stay, the Circuit Judge, *sua sponte*, announced that trial would resume on the singular issue of criminal contempt. The switch from civil to criminal contempt was made notwithstanding that the Nisi Petition sought to coerce payment through civil contempt, and during the first day of trial the Circuit Judge as well as the parties' attorneys repeatedly spoke of civil contempt and that the Debtor could avoid jail if he paid the Obligation before trial resumed. Although the Circuit Judge offered Boone and her attorney, Candice Shockley ("Shockley" and together with Boone, the "Respondents"), the opportunity to stop the trial in light of the Debtor's bankruptcy, they willingly joined in the newly contrived criminal prosecution that concluded with the Debtor being held in contempt and sent directly to jail.[3]

The Debtor filed a motion (Doc. 16, and herein the "Motion") asking this bankruptcy court to hold the Respondents in contempt for violating the automatic stay and to award damages and

---

[2] 11 U.S.C. § 101, et seq., and herein referred to as the "Code."

[3] A copy of the Circuit Judge's order sentencing the Debtor for criminal contempt was attached as an exhibit to the Debtor's Motion (Doc. 16, Ex. 4).

expenses, including attorney's fees, pursuant to Code § 362(k). The Respondents filed their Response in opposition to the Motion[4] (Docs. 33, 41), arguing, *inter alia*, that because the Circuit Judge held the Debtor in criminal contempt, they were exempt from the stay under Code § 362(b)(1). On October 24, this court conducted a hearing on the Debtor's Motion. At the hearing, Boone, Shockley, the Debtor, and his Circuit Court attorney, Douglas M. Roy, Jr., testified. After the conclusion of the hearing, the parties submitted memoranda supporting their positions, and the court took the matter under advisement. For the reasons stated herein, the court finds that both Boone and Shockley willfully violated the automatic stay, and therefore the court must grant the Motion and award damages.

<u>II - Jurisdiction</u>

The court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama. This proceeding is a contested matter under Federal Rule of Bankruptcy Procedure 9014 that arose in a case filed under Title 11, and seeks damages for an alleged violation of the automatic stay under Code § 362, and is, therefore, a core proceeding under 28 U.S.C. § 157(b)(1).[5] Further, the parties appeared before this court, submitted testimony, and

---

[4] The Motion also asked this court to order the release of the Debtor from jail. Although the Motion was heard on an expedited basis, the Debtor had already been released when the Motion was heard. The Debtor served four days of his sentence before being released on the order of another Circuit Court judge.

[5] "[T]he exercise of jurisdiction over the bankruptcy estate and the equitable distribution of the estate's property among the debtor's creditors are two of the three core *in rem* functions of a bankruptcy court. *Katz,* 546 U.S. at 363–64, 126 S. Ct. 990. The automatic stay is a fundamental procedural mechanism in bankruptcy that allows the court to carry out both of these functions. . . . Ordinarily, an adversary action arising out of a creditor's violations of the automatic stay forces the creditor to honor the automatic stay and thereby assists the bankruptcy court in carrying out its *in rem* functions. That holds true even where the action takes the form of a motion seeking contempt and sanctions." *In re Diaz*, 647 F.3d 1073, 1085 (11th Cir. 2011).

presented arguments and authorities on the issues, and raised no objection to this court's jurisdiction to enter a final order. Thus, the court has authority to enter a final order as to all aspects of this contested matter. This opinion shall constitute the court's findings and conclusions as required by Federal Rule of Bankruptcy procedure 7052. The court will enter a separate judgment and order conforming to this opinion.

III – Findings of Fact

(A) <em>Divorce, rule nisi petition, sheriff's sale</em>

Pursuant to an April 2, 2014 Agreement (the "Agreement"), which was incorporated into the Final Decree of Divorce dissolving Boone's and the Debtor's marriage, the Debtor agreed to pay Boone $60,000 in monthly installments of $1,000 each for 60 months, and $6,000 to Shockley for Boone's attorney's fees, also payable in monthly installments.[6] The Agreement provided that if there was a 30-day default, the entire Obligation would become due and payable in full "for which execution may issue."[7] The Debtor paid only one installment and then defaulted.

On December 23, 2014 Boone filed the Nisi Petition[8] asking that the Debtor "show cause why he should not be held in *civil* contempt for his willful refusal to comply with [the Final Divorce

---

[6] The Agreement and Final Decree of Divorce were attached as exhibits to the Motion (Doc. 16); neither party questioned their authenticity and they were referred to by the parties in their evidentiary submissions and arguments. The Agreement provided that the parties would each retain ownership of the property, real and personal, they then owned, and neither would pay periodic alimony. The Agreement specifically awarded the Debtor the business known as Goodson Funeral Home, Inc. and awarded Boone $60,000 "[a]s a property settlement."

[7] The effect of the default language was to give Boone an immediate judgment for the entire balance of the Obligation, which she could enforce against the Debtor and his property without first obtaining a further or separate judgment from the Circuit Court. There was no required notice of default and no right to cure. The acceleration of the balance of the Obligation was *ipso facto*.

[8] "A petition for a rule nisi seeking to hold a party in contempt for failure to abide by the provisions of an existing divorce judgment is a method of enforcing compliance with the existing

Decree]." (Doc. 16, Ex. 1, emphasis added.) The Nisi Petition further asked that if the Debtor were found in contempt—civil contempt being the only contempt mentioned—he should be incarcerated. *Id.* After his initial default, and while Boone's Nisi Petition was pending, the Debtor made additional payments, but never fully satisfied his Obligation.

At the same time the Nisi Petition was pending, Boone was also pursuing a sheriff's sale of the Debtor's residence, funeral home business, and automobile in an attempt to collect the Obligation. The sheriff's sale was imminent, and was being advertised when the Debtor filed his bankruptcy case. His bankruptcy stayed the sale.

(B) *Trial – first day, adjournment*

The trial of Boone's Nisi Petition commenced September 25, 2017, almost three years after it was filed. When the trial began, the Debtor's attorney argued that the Nisi Petition should be dismissed because the parties' Agreement effectively gave Boone a judgment as demonstrated by the imminent sheriff's sale of the Debtor's home, automobile, and funeral home business.[9]

---

divorce judgment." *Ex parte Montgomery*, 79 So. 3d 660, 669 (Ala. Civ. App. 2011), *subsequent mandamus proceeding,* 97 So. 3d 148 (Ala. Civ. App. 2012). Rule nisi petitions, akin to petitions seeking an order to show cause, are frequently used in Alabama domestic relations practice to enforce an existing court order that awarded support or property settlement payments in a divorce decree. Such petitions frequently ask that the delinquent defendant be held in contempt for failing to pay his obligation as previously ordered, and if necessary, that he be incarcerated to coerce payment. The defendant may purge himself of contempt by paying his obligation and avoid going to jail. It is not uncommon for debtors owing domestic support obligations or property settlements to seek protection in bankruptcy court by filing chapter 13 petitions with plans to pay such obligations through the trustee. Domestic support obligations, in the nature of support, are priority claims, and in most instances must be paid in full. Code § 1322(a)(2). State court judges, virtually without exception, recognize that chapter 13 bankruptcy stays proceedings commenced by rule nisi petitions based upon the failure to pay as ordered. Debtors are incentivized to make their plan payments knowing they may face incarceration in state courts if their bankruptcy case is dismissed. If a serial filer abuses bankruptcy protection, the solution is to seek stay relief coupled with a bar on further bankruptcy filings.

[9]  The Circuit Judge acknowledged that the entire amount owing had been reduced to judgment when, during the first day of trial, she warned the Debtor about the probable

Boone's attorney disagreed, and argued, "[W]here a divorce judgment incorporates an agreement as to the division of marital property and one party fails to live up to that agreement that they can be held in *civil* contempt of court. . . . [B]ecause it was proven that [the Debtor] had the ability to pay and he did not pay and so he can be held in *civil* contempt. . . . We're asking for a *civil* contempt finding . . . ." (Trans. 6- 7, emphasis added.)

In response to the argument that Boone's only recourse was to levy against the Debtor's property to satisfy the Obligation, the Circuit Judge stated, "And so it's your position that . . . this Court cannot . . . entertain a *civil* contempt action . . . ." (Trans. 9, emphasis added.)

As the trial progressed, in response to an evidentiary issue, the Circuit Judge stated, "I'll let you all go into some background information to help understand anything that the Court would need to understand to make a determination as far as any kind of *civil* contempt." (Trans. 58, emphasis added.) The Circuit Judge warned the Debtor that he was being confronted with two options: "You know they're trying to get you to pay over $39,000, right *or* go to jail; right?"[10] (Trans. 88, emphasis added.)

As the first day of trial came to a close, there was a colloquy among the attorneys, the Debtor, and the Circuit Judge. The substance of their conversation was that the trial would be continued to October 10—a Tuesday—and if the Debtor paid the balance of the Obligation, including Shockley's attorney's fees, the case could be dismissed. Much of the conversation

---

consequences of the sheriff's sale: "Did you understand that they have everything—enough to satisfy their entire judgment?" (Trans. 113.)

[10] Coercing payment with the threat of incarceration is a quintessential element of civil contempt. During the first day of trial, the exact amount the Debtor owed to Boone was never determined, but it was more than the $39,000 initially mentioned by the Circuit Judge. Apparently the parties are now in agreement: The Debtor scheduled his Obligation to Boone at $45,662.50 in his bankruptcy schedules and proposed plan, and Boone filed a proof of claim matching that figure. Shockley filed a claim for $7,612.50, which included the original $6,000 plus interest of $1,612.50.

centered on whether the Debtor could come up with the necessary funds, by borrowing them if necessary, before the scheduled sheriff's sale of his property, including his funeral home business. When the adjournment was announced, the Circuit Judge urged the Debtor to pay the Obligation before October 10 so the Lawsuit could be dismissed. The Circuit Judge instructed the Debtor, "I don't want to see you on Tuesday. Am I going to see you on Tuesday, October 10?" (Trans. 125). The Debtor responded: "So if I pay it, I don't have to come, that's what you're saying?" (*Id.*) The Circuit Judge confirmed that if he paid Boone and Shockley, then a motion to dismiss the Lawsuit could be filed. (*Id.*) Moreover, the Circuit Judge reminded the Debtor that he needed to pay Boone and Shockley to avoid the sheriff's sale of his funeral home, which, the Circuit Judge emphasized, would be bad for his business. (Trans. 119-20.)

The Circuit Judge explained Boone's position to the Debtor: "These people [the Respondents] want to know when they're going to have their money." (Trans. 116.) And she instructed the parties that, "I'm going to give you time—y'all time to figure out the numbers, figure out the interest and time for him to pay the money. Don't pay no money when you come to court. What I'm hoping for is y'all to come in here for trial and somebody say, hey, the issue is resolved. . . ." (Trans. 121.) No mention was made of criminal contempt, nor was there any mention that the Debtor was in danger of incarceration as a means of vindicating the court's authority regardless of whether he paid the Obligation. The entire hearing, and especially the Circuit Judge's closing remarks, unequivocally established that paying the Obligation would completely resolve the Lawsuit and Nisi Petition—and stop the sheriff's sale.

(C) *Bankruptcy*

After the adjournment, the Debtor tried to borrow the money to pay the Obligation, but could not acquire sufficient funds before the resumption trial, and on October 8, two days before

the trial was set to resume, he filed a chapter 13 bankruptcy petition, and his attorney filed a Suggestion of Bankruptcy with the Circuit Court. (Doc. 16, Ex. 3.) The chapter 13 plan filed by the Debtor proposed to pay all of his debts in full (as a 100% repayment plan), including his Obligation to Boone. (Doc. 58.)

(D) *Trial – second day, jump from civil to criminal contempt*

When the trial resumed on October 10, the Circuit Judge was initially not aware the Debtor had filed bankruptcy. The Circuit Judge instructed Shockley to continue with her cross-examination of the Debtor, but the Debtor's attorney interrupted and announced that his client had filed a chapter 13 bankruptcy case during the hiatus while the trial was continued, and as a consequence the trial was stayed under Code § 362. Shockley agreed—at least initially—and conceded she "probably [would be] found by the Bankruptcy Court to be in contempt if I continued this action today." (Trans. 131-33.) According to Shockley's testimony, upon learning of the Debtor's bankruptcy, the Circuit Judge became "visibly upset"[11] and without warning the Circuit Judge announced, *sua sponte,* that the trial would proceed on whether the Debtor should be held in criminal contempt, not civil contempt as requested in Boone's Nisi Petition and as expressly contemplated throughout the first day of the trial.

The Circuit Judge's decision to hold the Debtor in criminal contempt was predicated on the Debtor's "interruption" of the trial by filing bankruptcy:

> MR. ROY: Yes, ma'am. For the definition of criminal contempt is –if I can read it, Your Honor – it's misconduct of any person that obstructs the administration of justice and is committed either in the Court's presence or so near thereto as to interrupt, disturb, or hinder its proceedings. Again, we would argue that—

---

[11] In her testimony at the hearing on the Debtor's Motion, Shockley described the Circuit Judge's reaction when the Circuit Judge learned of the Debtor's bankruptcy.

THE COURT: Now, I would read that to say he interrupted this proceeding [by filing bankruptcy] in the middle of a carryover trial, just listening to what you said. Either – this case has been pending for three years, testimony having started on September 25. And in the middle of a carryover trial, he now attempts to disrupt this proceeding [by filing bankruptcy].

(Trans. 138-39.)

MR. ROY: Your Honor, the only argument is that this is a Rule Nisi proceeding. And if the matter is stayed, there's no opportunity for criminal contempt to arise.

(Trans. 140.)

Without question, the Circuit Judge's decision to elevate a civil proceeding to a criminal prosecution was in retaliation for the Debtor's having filed bankruptcy, and the leap from a civil to a criminal proceeding was an undisguised attempt to sidestep federal bankruptcy court jurisdiction by simply changing the label describing the proceeding. The Circuit Judge was not about to allow the Debtor to circumvent her court's jurisdiction by filing bankruptcy:

I practiced bankruptcy court and law for several years. And one thing I know about bankruptcy is it does not stop a court from proceeding on a criminal, criminal contempt. If I make a finding of criminal contempt, bankruptcy does not stay nor does it affect criminal fines, criminal penalty, nor does it affect criminal contempt. . . . But it's this Court's proceeding, that I have the right to proceed on the issue of criminal contempt. I can find him in criminal contempt upon proper pleading, proof, and evidence.

(Trans. 133-34.)

Notably, the Circuit Judge told the Debtor at the end of the first day of trial that she was doing him a favor and that if he paid, he did not have to return to court on Tuesday. The Circuit Judge's own synopsis of the matter—pay and avoid jail—established that the proceeding embodied the very essence of civil contempt.[12] Critically, when the Respondents were offered the

---

[12] The history of the Nisi Petition also supports this conclusion. The transcript of the first day of trial disclosed that in December 2015, in a prior hearing on the same Nisi Petition, the Debtor paid $5,000 because the parties had reached an agreement that if could pay $5,000 that

opportunity to halt this digression, they accepted the Circuit Judge's invitation to proceed, and agreed to resume the trial that ultimately resulted in the Debtor's incarceration.[13]

The Circuit Judge's disdain for the Debtor appeared to be triggered in large part by Boone's argument that after the divorce, the Debtor serendipitously gained the ability to pay the Obligation, but failed to do so. The Debtor owned and operated two small-town funeral homes; one in Anniston and the other in Roanoke. After the divorce, the Roanoke location suffered substantial fire damage and the Debtor, or at least his business entity that owned the funeral home, received an insurance settlement. Most of the settlement money was used to repair the fire damage, but a sizable portion was used by the Debtor to purchase a personal home and automobile, which cost more than enough to have satisfied his Obligation owing to Boone. The Debtor offered that he did not use the insurance money to pay Boone because he had a fiancé, and needed a home to live in when they married, and the automobile was used in his business.[14] He also mentioned that Boone

_____

day, he would not be incarcerated. He did pay the $5,000 and thus he did not go to jail. (Trans. 90-91.)

[13] Although the Circuit Court was willing, if not eager, to go forward despite the Debtor's counsel's protestations that the Nisi Petition was stayed, the court did offer to continue the matter if Shockley and her client agreed:

> If you all are in agreement to continue, fine, but the Court is – if you want to continue, it's fine, it will be by agreement. It is totally up to you-all. But the court is willing to proceed on the issue of criminal, which if he is found guilty of contempt, the Court only has one option, now. I can't make him pay the money, but this court can certainly entertain the relief requested regarding incarceration, which is five days in jail for each missed payment.

(Trans. 143-144). To this offer, Shockley declined to continue and replied, "Yes, ma'am. We'll go forward." (Trans. 144). At the hearing before this bankruptcy court, Boone testified that she was in complete agreement with the decision to go forward with the trial.

[14] It was unclear whether the automobile was used personally as well.

was awarded a Mercedes in the divorce, implying that he, too, needed an automobile. His excuses did not endear him to the Circuit Judge. Nonetheless, it is significant that the fire and insurance settlement occurred after the divorce, and there was no court order or agreement directing the Debtor to use his funeral business's unexpected financial recovery to pay Boone; if there had been such an order, criminal contempt might have been anticipated for his failure to do so.[15]

The Circuit Judge ultimately found the Debtor in criminal contempt, and sentenced him to 145 days in the Jefferson County jail, of which seven days were to be served and the balance suspended.

### (E) *County jail*

The Debtor, having anticipated that the civil contempt hearing would be held in abeyance as a result of his bankruptcy, was instead escorted from the courtroom directly to jail. Once behind bars, the Debtor slept on a metal bed with no mattress, and wore a jailhouse jumpsuit soiled with fecal matter left by its previous user. The Debtor is a 65-year-old funeral director, who suffers from diabetes, high blood pressure, sleep apnea, and a heart condition, who was never before incarcerated. When he expressed to the Circuit Judge that he needed his medications, he was informed that he should have brought them with him. He suffered without prescribed medications for two days before the jailhouse nurse allowed his family to bring his medication. The Debtor was required to eat six small meals a day to regulate his blood sugar, but received only the standard three meals while incarcerated, until the last two nights, when he was allowed a bologna sandwich

---

[15] As the Debtor points out in his brief (Doc. 49), this fact also distinguishes the instant case from that of *In re Allison*, 182 B.R. 881 (Bankr. N.D. Ala. 1995), in which the debtor had specifically been ordered to pay his back child support lump-sum when he received his Social Security disability payment, but failed to do so. Notably, the matter was before the bankruptcy court in *Allison* on a motion for relief from stay before proceeding with the contempt action in state court.

at 2 a.m.  When the jailhouse nurse checked his blood pressure, it was high but he was informed, "You're not dying."  He asked to be taken to the hospital and was refused.  The Debtor was frightened and physically stressed.  He was without his c-pap machine until the second night, but was required to plug it into the same outlet as the television used by the guards, and he had to ring a buzzer to ask the guards to turn the power back on whenever they turned off the television that also turned off his c-pap. He feared annoying the guards with these requests, but had no choice.

While the Debtor was in jail, he was unable to oversee his funeral home business and was forced to employ a substitute funeral director and embalmer at a cost of $6,500.  The Debtor served four days in the county jail, and was released on the order of another Circuit Court judge after the Debtor's lawyer filed a writ for habeas corpus, which Shockley, if not her client, supported.

(F) <em>Reclassification of property settlement</em>

On October 11, 2017, three days after the Debtor filed bankruptcy and the day after the Circuit Judge entered the order jailing the Debtor, the Circuit Judge entered another order, again *sua sponte*, declaring the $60,000 Obligation owing by the Debtor to Boone was to "be treated for all intents and purposes as a spousal support obligation" notwithstanding that it was designated a property settlement by the parties in their Agreement.  Boone's Nisi Petition did not seek a reclassification of the $60,000 Obligation from a property settlement to a support obligation.[16]

---

[16] During the first day of trial, September 25, the Debtor's counsel argued that Boone's Nisi Petition should be dismissed because she already had what was tantamount to a money judgment as demonstrated by the looming sheriff's sale of the Debtor's property.  As a way around that argument, the Circuit Judge announced, *sua sponte*, that the $60,000 would be considered alimony, but no order to that effect was entered until October 11.

## IV – Analysis and Conclusions

### (A) *Automatic stay*

Code § 362(a)(1) imposes the automatic stay and provides, in pertinent part, that, "Except as provided in subsection (b) of this section, a [bankruptcy] petition . . . operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial . . . action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy] case . . . to recover a claim against the debtor that arose before the commencement of the [bankruptcy] case . . . ." An action to collect a debt awarded to a former spouse in a divorce proceeding, whether the debt is for support or a property settlement, is subject to the automatic stay unless an exception applies.[17]

The Code further provides that ". . . an individual injured by any willful violation of a stay provided by this section *shall* recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Code § 362(k)(1) (emphasis added). A stay violation is willful if a creditor knew of the stay and took a deliberate action that violated the stay. *In re Davis*, 201 B.R. 835, 837 (Bankr. S.D. Ala. 1996). No specific intent is required, and a good-faith belief that the stay does not apply is no defense. *In re Caffey,* 384 B.R. 297, 304 (Bankr. S.D. Ala. 2008), *subsequently aff'd,* 384 Fed. Appx. 882 (11th Cir. 2010). Emotional distress damages are appropriate for a stay violation if the emotional harm's connection to the stay violation is "clearly established" or "readily apparent." *Id.* at 309 (quoting *In re Bishop*, 296 B.R. 890, 897 (Bankr. S.D. Ga. 2003)).

---

[17] *See In re Caffey*, 384 Fed. Appx. 882 (11th Cir. 2010); *In re Shelnut*, 2017 WL 1078535 (Bankr. S.D. Ga. 2017); and *Jordahl v. Dyal (In re Jordahl),* 555 B.R. 861 (Bankr. S.D. Ga. 2016), each discussed *infra*.

The Eleventh Circuit recently held that the actual damages recoverable by a debtor who suffered damages from a creditor's stay violation under Code § 362(k) include those attorney fees incurred not only in stopping the violation, but also attorney fees and costs incurred in prosecuting a damages action and defending the damages on appeal; something of a statutory shift from the American Rule. *Mantiply v. Horne (In re Horne)*, 876 F.3d 1076, 1081 (11th Cir. 2017) ("This explicit, specific, and broad language permits the recovery of attorneys' fees incurred in stopping the stay violation, prosecuting a damages action, and defending those judgments on appeal."). This is particularly appropriate because "[t]he lion's share of damages from violations of automatic stays are typically attorneys' fees. Most debtors are not in the financial position to afford an action to prosecute damages, and even if they could, limiting fees to those incurred in ending the stay violation would be too small to justify the expensive litigation that may follow." *Id.* at 1082.

The first exception to the automatic stay, and the exception raised as a defense by the Respondents in this case, is "the commencement or continuation of a criminal action or proceeding against the debtor."[18] Code § 362(b)(1). The Respondents argued that the Circuit Judge held the

---

[18] The action that landed the Debtor in jail does not neatly fit within the exception provided in Code § 362(b)(1). First, the Lawsuit was not "commenced" as a criminal action. Rather, it was commenced by a petition for rule nisi, a civil complaint, filed and tried in a domestic relations court as a civil "pay-and-purge" matter. It was only after bankruptcy was filed that the Circuit Judge *sua sponte* altered the posture of the *stayed* civil action to a criminal prosecution. Second, the Lawsuit was not a postpetition "continuation" of a prepetition criminal proceeding; it was the corruption of a prepetition civil action. And third, the Lawsuit was not a postpetition "commencement" of a criminal action. There was no "commencement" of a new action or proceeding when the trial resumed the second day. There was instead a blatant attempt to thwart the reach of the automatic stay by re-labeling a stayed civil action into one re-styled as criminal contempt. No new criminal action was commenced. Thus, the exception found in Code § 362(b)(1) for criminal actions that are either commenced or continued postpetition does not precisely apply. Moreover, the rule nisi Lawsuit against the Debtor was never a legitimate criminal action or proceeding. Nonetheless, the Debtor's Motion need not be decided on a technical reading of § 362(b)(1).

14

Debtor in criminal, not civil contempt, and criminal contempt is excepted from the automatic stay. But once you look beyond labels, it is evident the contempt was in fact civil and not criminal. The Eleventh Circuit's decision in *In re Caffey*, 384 Fed. Appx. 882 (11th Cir. 2010) supports the Debtor's Motion and refutes the principal defense raised by the Respondents.

Proceedings for contempt may be either criminal or civil, depending on the purpose of the sanction. *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.)* 92 F.3d 1539, 1557-58 (11th Cir. 1996). Whether contempt is criminal or civil is not controlled by the label employed by the state court, but rather "depends on a factual question—whether the state court contempt order contained a purge amount." *Caffey,* 384 Fed. Appx. at 886. In the instant case, the purge amount required to end the Lawsuit and the threat of incarceration was unequivocally announced by the Circuit Judge during the first day of trial and it never changed until after the bankruptcy was filed—that change came too late, and itself violated the stay.

In *Caffey,* the state court set a purge amount in its final judgment order, which the Eleventh Circuit found to be completely consistent with civil contempt rather than criminal contempt. *Id.* In the instant case, the Circuit Judge's *post-bankruptcy* order finding the Debtor in contempt did not contain a purge amount; however, at the end of the first day of trial, before the Circuit Judge *sua sponte* converted the civil proceeding into a post-bankruptcy criminal prosecution, she told the Debtor in no uncertain terms that if he paid his former wife what he owed her, the case would be dismissed and he would not need to return to court. During the first day of trial, the Circuit Judge explained to the Debtor that he had two options: pay the Obligation to Boone or face incarceration.

Likewise, during the first day of trial, Shockley and the Circuit Judge repeatedly referred to the rule nisi proceeding as one for civil contempt, not criminal contempt. The pre-bankruptcy purge amount stated on the record by the Circuit Judge was the amount required to pay the

Obligation in full. Under the guidance of *Caffey*, if the prosecution was truly for criminal contempt and the vindication of the Circuit Court's authority, it could not have been resolved by payment of the money owing to Boone. Before the trial resumed the second day, the Debtor filed bankruptcy, and if the Circuit Court and Respondents had honored the automatic stay, as they were required to do, the collection efforts pursued by Boone in the civil Lawsuit would have immediately stopped and so would have the trial; it would have never regressed into a fabricated criminal prosecution.

If the Respondents were not satisfied with the Debtor's proposal to pay Boone through his chapter 13 plan, they should have sought stay relief under Code § 362(d) or asked the bankruptcy court to abstain pursuant to 28 U.S.C. § 1334(c)(1). The mandate of the automatic stay and a bankruptcy court's jurisdiction are not so flimsy that they can be circumvented by a simple play on words and stay-avoidance shenanigans. The exclusive jurisdiction over bankruptcy cases, and until relinquished, proceedings under the Code, bestowed by Congress on the federal courts cannot be so easily subverted. 28 U.S.C. § 1334(a). As mentioned, creditors who believe debtors are abusing bankruptcy protection, including hiding behind the automatic stay in bad faith, may seek stay relief or abstention in the bankruptcy court. The Respondents' post-bankruptcy scheme, even with the Circuit Court's blessing, to sidestep the automatic stay, constituted blatant disrespect for established federal law and this bankruptcy court, and is cause for sanctions.

In a recent bankruptcy case where the state court judge referred to the debtor's contempt as both civil and criminal, the bankruptcy court, citing *Caffey*, found the contempt was only civil in nature, and thus subject to the automatic stay, notwithstanding the state court's dual label:

> The Eleventh Circuit has stated notwithstanding labels, the inquiry of whether an arrest warrant for contempt is criminal in nature is whether its primary purpose is to uphold the dignity of the court or whether it is really being used as a collection device *initiated* by a private party.

Case 17-41820-JJR13   Doc 71   Filed 02/05/18   Entered 02/05/18 13:21:26   Desc Main
Document      Page 16 of 25

*In re Shelnut*, 2017 WL 1078535, *8 (Bankr. S.D. Ga. 2017) (emphasis added). The bankruptcy court in *Jordahl v. Dyal (In re Jordahl),* 555 B.R. 861, 864 n. 1 (Bankr. S.D. Ga. 2016) further explained that the purpose of the sanction controls: "Contempt proceedings may be either civil or criminal, depending on the purpose of the sanction. *Souther v. Tate (In re Tate),* 521 B.R. 427, 440 (Bankr. S. D. Ga.2014) (citing *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.*), 92 F.3d 1539, 1557–58 (11th Cir.1996)). When the sanction is punitive and imposed to uphold the dignity of the court, the contempt proceeding is criminal. *Id.* Where, as here, the sanction is intended to compensate the complainant and coerce the contemnor's compliance with the court's order, the contempt is civil." [19] As the analyses in *Caffey, Jordahl, and Shelnut* amply demonstrate, the state court's label is not binding on the bankruptcy court's ability to determine the true nature of state-court contempt proceedings, and what impact the automatic stay has upon those proceedings.

A decision relied upon by the Respondents supports this court's finding that the Lawsuit was a civil contempt proceeding. The Respondents submitted a copy of an opinion entered in *In re Hefty,* Case Number 13-71974 (Bankr. W.D. Ark. 2013). That opinion confirmed that where "the debtor can avoid incarceration by taking some additional action or that the purpose of the Order is to coerce compliance with a previous order," then the matter is one of civil contempt. The record demonstrates that the Lawsuit was in exactly

---

[19] In *Jordahl*, the void order was not saved by virtue of the exceptions to the automatic stay in Code § 362(b)(2)(B) or (b)(2)(C), which allow collection of a domestic support obligation from property that is not property of the estate, or pursuant to an existing wage garnishment order. Neither of those exceptions would apply in the instant case, and neither was argued by the Respondents.

such posture, by the Circuit Judge's own directives, immediately before the Debtor filed bankruptcy.

The other decisions cited by the Respondents are similarly inapposite. They stand for the proposition that a true criminal contempt proceeding related to a divorce action is excepted from the automatic stay under Code § 362(b)(1). However, those cases do not stand for the proposition that a state court can proceed post-bankruptcy in a civil contempt proceeding by simply changing the nomenclature of the action from civil to criminal and thereby avoid the automatic stay.

On October 8, immediately upon the filing of the Debtor's bankruptcy petition, the collection efforts *initiated* by Boone's Nisi Petition were stayed—everything related to that debt-collection action should have come to a complete and absolute halt. "Arguably the most powerful of protections under the Bankruptcy Code, the stay prohibits almost all judicial proceedings and other collection or enforcement attempts against the debtor, the debtor's property, or property of the bankruptcy estate. *See* 11 U.S.C. § 362(a). Specific to the matter here, the stay applies to civil contempt proceedings." *Jordahl*, 555 B.R. at 864 (citing *Goodman v. Albany Realty Co. (In re Goodman),* 277 B.R. 839, 841–42 (Bankr. M.D. Ga. 2001); and citing *Mitchell Constr. Co. v. Smith (In re Smith),* 180 B.R. 311, 319 (Bankr. N.D. Ga. 1995)). Other than the administrative formality of announcing that the trial of the civil contempt rule nisi Lawsuit would not resume due to the bankruptcy stay, *any* further action with respect to the Debtor's Obligation was an intentional stay violation. In fact, the Debtor was not even required to attend the second day of trial. Actions taken by creditors and courts in violation of the stay are void *ab initio* and of no force or effect. *United States v. White*, 466 F.3d 1241, 1244 (11th Cir. 2006) (quoting *Borg-Warner Acc. Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982)). Thus, the second-day hearing itself, as well as the

Circuit Judge's order imposing the jail sentence, were void *ab initio* as violations of the automatic stay. *See Jordahl*, 555 B.R. at 867 (finding that the state court's postpetition hearing and order holding the debtor in contempt for failing to pay child support were void as violations of the automatic stay, and further finding that the creditor's attorney fees and costs related to the void hearing did not give rise to a claim for payment). *See also In re DeSouza*, 493 B.R. 669 (1st Cir. BAP 2013) (holding that postpetition contempt proceedings and the debtor's subsequent incarceration for failure to pay alimony were violations of the automatic stay).

The Respondents want this court to recognize as legitimate the Circuit Court's transformation of the civil contempt Lawsuit to a criminal proceeding. But via the immediate imposition of the automatic stay, the Lawsuit stopped when the Debtor filed bankruptcy; there was no grace period during which the Lawsuit could be altered to a criminal proceeding. If there were truly grounds to hold the Debtor in criminal contempt (and this court cannot find any, but that is beside the point), a new proceeding needed to be commenced. Post-bankruptcy, the Lawsuit could not proceed for any purpose other than administrative housekeeping that paid homage to the automatic stay.

The Respondents were complicit with the Circuit Judge in resuming the trial, and willfully and intentionally elected to proceed when given the option to stop, even after Shockley correctly announced that by doing so she might be found in contempt by a bankruptcy court for violating the stay. And although it is too late to order the release of the Debtor from jail, the Circuit Court's post-bankruptcy, second-day hearing, along with the orders dated October 10 and 11, respectively (Doc. 16, Exs. 4 and 5) are void and of no effect.

(B) *Rooker-Feldman*

Respondents also contend that this bankruptcy court cannot question the Circuit Court's post-bankruptcy invocation of the "criminal" contempt label based on the *Rooker-Feldman* doctrine. Such reliance is misplaced and ignores the critical timing requirement for the doctrine to apply. "Under the *Rooker-Feldman* doctrine, federal [courts] do not have jurisdiction to review state court decisions. The doctrine's boundaries are not always clear, but they are clearly narrow. *Rooker-Feldman* applies only in 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered *before* the [federal] court proceedings commenced and inviting [federal] court review and rejection of those judgments.'" *May v. Morgan County*, 878 F.3d 1001, 1005 (11ᵗʰ Cir. 2017) (quoting *Nicholson v. Shafe*, 558 F.3d 1266, 1274 (11th Cir. 2009) (internal citations omitted) (emphasis added). "[W]e adhere to the language in *Exxon Mobil*, delineating the boundaries of the *Rooker–Feldman* doctrine: 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.' Because the Appellants commenced the federal district court action before the end of state proceedings . . ., we find that the *Rooker–Feldman* doctrine does not apply here." *Nicholson*, 558 F.3d at 1274 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

*Exxon Mobil* made it clear that "the state court must have rendered judgment before the district court proceedings commenced." *Id.* It is undisputed that the "ruling" that attempted to convert the Lawsuit into a "criminal" proceeding, and the ruling that found the Debtor in contempt and resulted in his incarceration, were made *after* the bankruptcy petition was filed and the automatic stay had gone into effect. Thus, *Rooker-Feldman* does not apply here. In any event, this court is not reviewing or reversing the merits of the Circuit Court's post-bankruptcy hearing

and rulings. To the contrary, this court instead finds that the convening of the post-bankruptcy hearing, along with the rulings and orders that resulted from that hearing, were void as having been done in violation of the automatic stay, regardless of their purported content. The Lawsuit, as it existed at the moment the Debtor filed bankruptcy, was strictly one for civil contempt, and it therefore was stayed automatically upon the filing of the Debtor's chapter 13 petition. To proceed at all in the Lawsuit after the bankruptcy was filed was to proceed too far.

The Respondents cite cases in support of the Circuit Judge's having the ability to decide if the automatic stay applied to the Lawsuit, but this court does not find them persuasive. In response to those cases, this court agrees with and adopts the reasoning of Judge Sacca, United States Bankruptcy Judge for the Northern District of Georgia, who wrote:

> This Court concludes that the *Rooker–Feldman* doctrine does not bar it from determining the applicability of the automatic stay despite the State Court's prior determination. State and federal courts have concurrent jurisdiction to determine whether litigation is stayed pursuant to the automatic stay. Courts have reached differing results on whether the *Rooker–Feldman* doctrine applies to prevent a bankruptcy court from reviewing a state court's determination of whether the automatic stay applies. The Third and Ninth Circuits, along with many bankruptcy courts, have concluded that a bankruptcy court may review such decisions. These courts rely on the U.S. Supreme Court case *Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940), which created an exception in bankruptcy cases to the general rule that judgments determining jurisdiction should be corrected through direct review, not collateral attack, because erroneous decisions by state courts as to the applicability of the automatic stay are *void ab initio.* Further, they reason that any incorrect determination that the stay does not apply when it actually does would, in effect, be a modification of the automatic stay—relief that the bankruptcy court has exclusive jurisdiction to provide. Other courts have applied the *Rooker–Feldman* doctrine and found no exceptions for the bankruptcy court to review a state court's determination of the applicability of the automatic stay because state courts have concurrent jurisdiction.
>
> This Court joins the line of cases that concludes the *Rooker–Feldman* doctrine does not bar a bankruptcy court from reviewing a state court's determination of whether the automatic stay applies. The automatic stay is one of the most fundamental protections that the Bankruptcy Code provides to debtors. Bankruptcy courts have exclusive jurisdiction to grant relief from the automatic stay. If a state court incorrectly determines that the stay does not apply then it is, in effect, granting relief

Case 17-41820-JJR13   Doc 71   Filed 02/05/18   Entered 02/05/18 13:21:26   Desc Main
Document      Page 21 of 25

from the automatic stay, something only bankruptcy courts have authority to do. Such a result would strip a debtor of the full protection provided in the Bankruptcy Code. In order to determine whether the state court erroneously concluded that the automatic stay does not apply to a particular proceeding, the bankruptcy court must have the ability to review the state court's decision. Requiring a debtor to appeal to a state's appellate courts to determine such an issue would be an unjust result for the debtor who is already before the bankruptcy court to gain the very protection it would then have to litigate in another forum. In addition, judicial proceedings in violation of the automatic stay are *void ab initio* which could render entire proceedings or trials void upon a later determination that the automatic stay was applicable. Bankruptcy courts are specialized courts, well versed in the application of the automatic stay, and must have authority to review a state court's determination of whether the stay applies in order for a debtor to have the full protection of the automatic stay as provided for in the Bankruptcy Code.

*In re Cole*, 552 B.R. 903, 908–09 (Bankr. N.D. Ga. 2016); *see also In re Long*, 564 B.R. 750 (Bankr. S.D. Ala. 2017) (adopting the reasoning in *Cole*); *and see In re Clarke*, 373 B.R. 769, 771 (Bankr. S.D. Fla. 2006) ("*Rooker-Feldman* doctrine does not abrogate the bankruptcy court's authority to enforce the automatic stay.").[20]

(C) *Damages*

Having found a willful stay violation, the court next turns to damages. Code § 362(k) mandates an award of actual damages that result from a willful stay violation. Although neither side raised the issue, before imposing sanctions for stay violations in cases involving domestic support obligations, bankruptcy courts should consider abstention in some narrow circumstances.

---

[20] Bankruptcy, and its ensuing automatic stay, force all creditors to gather under one judicial tent—a federal bankruptcy court. For those who want out, and have good cause, Code § 362(d) provides an exit. But if the bankruptcy court's jurisdiction can be so easily usurped by a non-bankruptcy court, as the Respondents suggest, uncertainty will prevail, and each bankruptcy case will be followed by a trek of creditors to those state courts who, perhaps understandably, are known to resent having their jurisdiction interrupted when defendants seek bankruptcy protection. The danger, as Judge Sacca notes, is that some of those state courts may be willing to proceed against the debtor and estate property under circumstances that a bankruptcy court, with its specialized knowledge of and experience with the Code, would not consider an exception to, or as good cause for lifting, the stay. Such will destroy the authority of bankruptcy courts and the opportunity of debtors to achieve the financial fresh start anticipated by Congress.

*Caffey,* 384 Fed. Appx. at 885 (citing *Carver v. Carver,* 954 F. 2d 1573, 1579-80 (11th Cir. 1992)). Bankruptcy courts should abstain from imposing sanctions if other creditors were not harmed by the post-petition collection action and the debtor's incarnation, and if the debtor is using bankruptcy as a "weapon" to avoid paying a support obligation. Neither circumstance applies here.

The Debtor's incarceration prohibited him from operating his funeral home, both as manager and embalmer, and he incurred the expense of employing someone to take his place. A small-town funeral director's business is necessarily harmed, and along with it his means of earning a living and paying his bills, when news of his incarceration spreads. Thus, the Debtor's income, property of the estate that should be used to pay creditors under the Debtor's plan, was instead diverted and used to pay someone else to keep the Debtor's funeral home in operation for the days he was in jail. The harm to his business reputation and future business is impossible to measure but is certainly real. Moreover, the Debtor is not using his bankruptcy as a means to avoid paying Boone. To the contrary, his plan proposes to pay all his creditors, including Boone, in full. And if the automatic stay had not stopped the sheriff's sale pursued by Boone, it is likely the Debtor's funeral home business would have been sold on the courthouse steps, and he would have been without means to pay his other creditors through his chapter 13 plan. At 65 years of age, it is doubtful the Debtor could find another means to support himself, much less to pay his creditors, including Boone.

Thus the expense of hiring a substitute funeral director and embalmer while the Debtor was incarcerated are actual damages. According to the Debtor's uncontested testimony, those expenses totaled $6,500.00.

The emotional distress suffered by the Debtor when forced to endure four days' incarceration in a county jail under the conditions he described is readily apparent and unquestionably connected to the stay violation. *In re Bishop*, 296 B.R. 890, 897 (Bankr. S.D. Ga. 2003). Based upon the Debtor's undisputed testimony, the harm he suffered was emotional and physical, and was severe. The court concludes that $20,000 ($5,000 for each day's incarceration) is adequate and reasonable to compensate the Debtor for the emotional and physical destress he suffered. No doubt the Debtor's business reputation was harmed and he probably will lose business as a result, but determining the amount of lost business is too speculative and the court will not award damages for the same. Additionally, the court concludes that the Respondents' choice to proceed with the Circuit Court Lawsuit knowing it would likely conclude with the Debtor's incarceration warrants the imposition of punitive damages. The court assesses punitive damages in the amount of $15,000.

The compensatory damages for the substitute funeral director, emotional and physical destress, together with the punitive damages, total $41,500 and shall be offset, pro-rata, against the claims filed by Boone and Shockley, respectively, in the Debtor's bankruptcy case.[21]

The Debtor's actual damages also include his expenses that are directly attributable to the stay violation, most notably his attorney's fees and costs, incurred in his unsuccessful attempt during the second day of trial to enforce the automatic stay in the Circuit Court Lawsuit (other than the initial announcement that the Debtor had filed bankruptcy), and to gain his release from jail. Likewise, he is entitled to recover the attorney's fees and costs he incurred prosecuting his Motion.

---

[21] Boone and Shockley filed proofs of claim for $45,662.50 and $7,612.50, respectively; totaling $53,275.00. Thus, Boone's pro-rata share is 86%, resulting in a $35,690.00 setoff against her claim, and Shockley's share is 14% resulting in a $5,810 setoff.

Those expenses, in an amount to be determined by separate order, shall be paid, in cash, and assessed against Boone and Shockley, as their joint and several liability.

In the order entered in conformity with this opinion, the court will set a hearing at which it will consider the amount of attorney's fees and costs recoverable in cash by the Debtor as actual damages in addition to those described above. Within twenty-one (21) days from the entry of this opinion and related order, the attorneys for the Debtor (including his Circuit Court attorneys who incurred fees on the second day of trial and represented the Debtor in obtaining his release from jail) shall file applications complying with Federal Rule of Bankruptcy Procedure 2016 and the court's local rules, itemizing the fees and expenses incurred relative to the these matters. The Respondents will have an opportunity to respond and be heard in opposition to the reasonableness and necessity of the fees.

So done this 5th day of February 2018.

/s/ James J. Robinson
JAMES J. ROBINSON
CHIEF UNITED STATES BANKRUPTCY JUDGE